# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:20-cr-00017-MFU** |
| | ) | |
| | ) | |
| **SAMUEL SILVA** | ) | |

### SAMUEL SILVA'S AMENDED FIRST MOTION FOR DISCOVERY

Samuel Silva, by and through counsel, pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *Banks v. Dretke*, 540 U.S. 668, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004); *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution, Rules 12(b)(3)(e) and 16 of the Federal Rules of Criminal Procedure, hereby moves this Court to enter an order requiring the government, including Federal Bureau of Prisons (BOP) personnel, to disclose and provide the specific information and materials listed within.

# **Table of Contents**

I.   Background.................................................................................................3

   A.   Samuel Silva........................................................................................3

   B.   Abraham Aldana .................................................................................4

   C.   Bureau of Prisons – USP Lee.............................................................6

   D.   September 14, 2018 ...........................................................................15

   E.   Discovery Provided Pre-Indictment and Post-Indictment................17

II.  Legal Discussion......................................................................................19

   A.   Mr. Silva is seeking discovery that he is entitled to receive under well-
      established law. ..................................................................................19

   B.   The legal bases for the discovery requested in this case. ................23

III. Specific discovery and *Brady* requests .................................................26

   A.   Discovery related to the events of September 14, 2018. ..................27

   B.   Discovery Related to BOP Prison Security, Staffing, and Incidents of Violence
      at BOP Institutions. ..........................................................................41

   C.   Discovery related to Prison Gangs. ..................................................45

   E.   Discovery of information relating to the decedent............................47

   F.   Discovery regarding witnesses working with the government or providing
      information to the government. ..........................................................50

IV.  Severability..............................................................................................52

V.   Continuity of Request .............................................................................52

VI.  Conclusion ..............................................................................................54

# I. Background

## A. Samuel Silva's Custodial History

Samuel Silva was born in Albuquerque, New Mexico on August 1, 1975 to Manuel Silva, Sr. and Glares Silva. Due to a catastrophic failure of the support structures all children require but Mr. Silva never had, a substantial part of Mr. Silva's life has been spent in custody.

On August 14, 2012, Mr. Silva was placed on parole after completing a lengthy State sentence. On July 17, 2014, while still on state parole, Mr. Silva was arrested on federal charges of carjacking, brandishing a firearm, and possessing a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year. Once arrested, Mr. Silva was in the custody of the United States Marshals Service. Mr. Silva was convicted of the federal charges and was sentenced to a 47-year custodial sentence on February 22, 2017. He entered the Federal Bureau of Prisons (BOP) shortly thereafter. He was 42 years old.

Mr. Silva's first BOP designation was to the United States Penitentiary (USP), Victorville, California. He arrived at USP Victorville on April 13, 2017. One day after his arrival, Samuel Silva was assaulted and stabbed by three inmates. He then entered the Special Housing Unit (SHU) at Victorville as an assault victim. BOP staff at Victorville concluded that there was a "valid threat to Silva's safety and he cannot return to population."

Given the threats to Mr. Silva's safety, he was transferred by the BOP to USP Pollock, Louisiana. He was notified upon his arrival at USP Pollock on June 27, 2017, that general population was not safe for him there either. BOP staff at Pollock

concluded that, "Silva would be assaulted by the Texas Syndicate and Mexikanemi gang inmates" and recommended that he again be transferred to another facility for his safety.

On August 15, 2017, Mr. Silva arrived at USP Lee. Until September 14, 2018, he was incident-free at USP Lee. On September 14, 2018, Mr. Silva was immediately moved to the Special Housing Unit (SHU) at USP Lee due to the death of his cellmate Abraham Aldana.

On April 22, 2021, the BOP's Discipline Hearing Officer (DHO) imposed the following sanctions on Mr. Silva: Disallowance of 41 days Good Conduct Time; Forfeiture of 90 days Non-Vested Good Conduct Time; Loss of Commissary, Phone, Email, Visiting and MP3 Player Privileges for 365 days; a Monetary Fine of $118; and Disciplinary Segregation for 120 days. Mr. Silva spent 998 days at USP Lee's SHU before he left USP Lee on Tuesday, June 15, 2021. He was initially sent to USP Atlanta and then the Oklahoma City Transfer Center before finally arriving at the Administrative Supermax facility (ADX) in Florence, Colorado on August 11, 2021. Mr. Silva is presently serving a 96-month sentence in the Control Unit of the ADX.

Mr. Silva is charged in this Court for causing Abraham Aldana's death, an alleged violation of Title 18 U.S.C § 1111.

### B.     Abraham Aldana

The decedent Abraham Aldana was serving a 324-month prison sentence at the time of his death on September 14, 2018. He had been found guilty of two counts of Racketeering and one count of a Violent Crime in Aid of Racketeering, specifically, conspiring to assault incarcerated rival gang members. On March 16, 2003, the

Department of Justice issued a press release that described Mr. Aldana as "an aggressive lieutenant" in the Puente-13 gang, a group subservient to the violent Mexican Mafia, who facilitated the "conspiracy to murder and assault rival gang members." A trial memorandum filed by the U.S. Attorney's Office for the Central District of California stated witnesses would describe Mr. Aldana as the "most aggressive and prolific lieutenant" in the Puente-13 gang.

His increasingly belligerent behaviors required BOP to continually transfer him to multiple high-security facilities. For example, Mr. Aldana arrived at USP Hazelton in August 2013. By October 2013, Aldana was causing problems with other inmates. Because of the danger Mr. Aldana posed, he was transferred to USP Big Sandy. He arrived there on February 20, 2014. Less than two months later, on April 22, 2014, BOP yet again determined he was a threat to inmate safety and transferred Mr. Aldana.

From Big Sandy, Mr. Aldana went first to USP Atlanta. One day after he arrived, on June 6, 2014, officers observed Mr. Aldana punching his cellmate in the face multiple times. He was quickly transferred to another high security facility. Eventually, Mr. Aldana arrived at USP Lee on March 27, 2018. Consistent with past behavior, Mr. Aldana severely beat his former USP Lee cellmate, Rudy Ball. This assault happened on May 8, 2018—less than two months after his arrival. Mr. Ball required hospitalization after the beating that left him with multiple severe injuries necessitating facial surgery for bilateral orbital blowout fractures. Additionally, Mr. Ball suffered a concussion, multiple contusions, and fractured ribs. Unlike the

previous times when Mr. Aldana assaulted others, he was not transferred to another institution. Instead, he was returned to general population at USP Lee, ultimately sharing a cell with Samuel Silva.

Warden Breckon assumed leadership at USP Lee in 2018. Prior to Warden Breckon's arrival, inmates had been able to arrange cell changes fairly easily. They simply needed to make a request. But after Warden Breckon took over, this practice changed and USP Lee essentially stopped approving inmate requests for cell changes. This practice extended to the A-Unit where Mr. Silva and Mr. Aldana were housed.

Prior to September 14, 2018, Mr. Silva, like Mr. Ball, concluded that he could no longer be safely housed with Mr. Aldana. Mr. Silva sought a way to change cellmates, in hopes of avoiding Mr. Aldana's escalating aggressiveness and constant threats. First, he tried to find someone who would agree to live with Mr. Aldana. There were no takers; no one else in A-Unit would agree to be housed with Mr. Aldana. Then, Mr. Silva asked the BOP—on multiple occasions—that he be given a cellmate other than Mr. Aldana. The BOP did not allow the cell change and chose to leave the two men in the same cell.

These facts about Mr. Aldana are not offered to minimize the value of his life. They are offered because they may impact decisions relating to the discoverability of the records outlined below.

### C.   Bureau of Prisons – USP Lee

The United States has the highest per capita population of prisoners in the world. Beginning in the late 1980s, the BOP had exponential growth in the number of its inmates.

This was caused largely by legislation that increased the numbers of prosecutions in federal court. Simultaneously, sentences increased due to enhancements that focused on drug distribution and firearm offenses. Judicial discretion in sentencing was reduced because of the Federal Sentencing Guidelines. Parole was abolished. Rehabilitation programs became nearly non-existent; access to higher education was curtailed; prisoners became ineligible for Pell grants and similar funding for education. Due to the increase in prisoner population, there was a federal "prison building boom."[1] USP Lee was a part of that boom. Construction of USP Lee was completed in 2002 and it began housing inmates the same year.

The BOP is required to provide for the "protection," "safekeeping," and "care" of "all persons charged with or convicted of offenses against the United States." 18 U.S.C. 4042(a)(2), (3). *Rich v. United States*, 811 F.3d 140, 145 (4th Cir. 2015), citing *Cohen v. United States,* 151 F.3d 1338, 1342 (11th Cir. 1998). But the United States Penitentiaries can be violent places. USP Lee has been, since its inception, a particularly violent place.

Incarcerated individuals are frequently left to fend for themselves. Those in federal custody lack a meaningful way to seek redress for grievances within the prison itself. If a person complains about threats of violence, or a pending assault, they are frequently ignored or are punished by being placed in the SHU. Placement in the SHU can last for months, or even years.

---

[1] See Tracy Huling, "Building a Prison Economy in Rural America", Invisible Punishment: The Collateral Consequences of Mass Imprisonment (2002)

Incarcerated individuals, correctional officers, and even the administration understand the dynamics that exist behind the prison walls. Because of the myriad of issues that exist and the lack of remedies available, sometimes individuals feel compelled, justified or not, to take matters into their own hands. Violence between incarcerated individuals at Lee is at high levels, including in September 2018. Little or no meaningful protective measures are taken before such assaults occur, and little or no meaningful assistance is given by correctional officers to render aid while an assault is occurring. Violence between incarcerated individuals and staff members receives prompt attention, is prosecuted, and publicized.[2] However, because of limited disclosure of details relating to persistent violence between inmates, public knowledge about the nature and extent of BOP violence is limited.

As noted above, an internal quasi-judicial disciplinary process exists whereby violations of the rules are adjudicated, testimony is sometimes heard, and factual findings and ultimate decisions are made by a correctional officer called a Disciplinary Hearing Officer (DHO). The DHO serves as a sort of magistrate or "justice of the peace." Those factual findings and ultimate decisions are written into a "DHO report." The proceedings are not open to the public, the testimony is not transcribed, and the final DHO report is not available to the public.

---

[2] See *e.g.*, https://wcyb.com/news/local/authorities-usp-lee-staff-member-hospitalized-following-assault; https://www.wjhl.com/news/local/staff-member-assaulted-at-usp-lee/, https://www.wjhl.com/news/local/usp-lee-on-lockdown-after-staff-members-assaulted/; https://wcyb.com/news/virginia-news/usp-lee-inmate-pleads-guilty-to-assaulting-corrections-officer

Some information regarding the level of violence can be gleaned through painstaking research of *pro se* filings on Pacer and other sources. However, these sources do not fully expose an individual event and there are large gaps because internal BOP records are not available to the general public. Additionally, on the few occasions when some probative information is made available to members of the bar in a particular civil or criminal matter, protective orders are sought by the BOP and routinely granted, thereby preventing greater disclosure of important information.

For a time, the correctional officers' union (Council of Prison Locals C-33) that represents correctional officers who work at Lee, gave a daily summary or log of violent incidents with very little details on their public webpage. However, that section was taken down (at least to public view) some time ago. A *small* sample from a now-closed section of the website[3] demonstrates the shocking level of violence at USP Lee:

| Date | Description of Incident |
|------|------------------------|
| 2/4/11 | At 9:51a.m., a cell fight was called in SHU. Staff had to enter the cell and physically separate both inmates. Both inmates resisted staff and would not let staff restrain them. Staff had to physically restrain both inmates and remove them from the cell. There were no staff injuries reported. <br><br>**At 3:35p.m., a fight was announced in front of building 1. As responding staff arrived all involved inmates ran and went in the housing units. Staff identified all involved inmates and placed them in SHU. There were no Staff injuries to report |

[3] https://web.archive.org/web/20111206135250/http://www.cpl33.info:80/id29.html (all errors *sic*).

| Date | Description of Incident |
|------|------------------------|
| 2/2/11 | At 1:03 p.m., a unit officer activated his body alarm due to a staff assault on him and another officer. The two officers were in the unit office testing intoxicants found in the inmate's cell. The inmate came into the office and assaulted the two officers with closed fist. The officers gained control of the inmate and placed him in restraints. As additional staff arrived, they locked down the unit and the inmate was escorted to Special Housing. At 1:18p.m., a recall was announced and all inmates were ordered to return to their housing assignments. At 1:20 p.m., a staff needs assistance call was announced in the SHU Corridor, the inmate involved in the earlier assault became assaultive towards staff and was placed on the floor. A total of seven staff were injured during the assault, two with the initial assault and five responding to the two different incidents. USP Lee was placed on lock down status due to the assaults. |
| 10/31/10 | At 11:00a.m., A-unit called for compound to step to A-unit to pick up two inmates for a possible assault. At 11:32a.m., a fight was called over the radio by Compound Officers, involving multiple inmates with weapons. As staff were controlling these combatants, a staff needs assistance was called over the radio at 11:35 AM for another fight. Control was ordered to recall staff to the institution due to the amount of inmates involved. A staff needs assistance was called at 11:53a.m., due to an attempted assault on staff while attempting to secure his unit. Inmate combatants were medically assessed, and secured in the Special Housing Unit and R&D. Twenty–One inmates were placed in Special Housing for fighting. Four staff members received injuries and one staff member was transported to an outside hospital for injuries received. USP Lee placed on lockdown status. |
| 10/7/10 | At 2:47 p.m., a cell fight was called in Special Housing. SHU staff gave both inmates several orders to stop fighting and to submit to hand restraints and they both refused. After a sufficient amount of staff were present, the cell door was opened and staff entered the cell and physically separated and restrained both inmates. One staff member received injuries during this incident. |
| 9/15/10 | At approximately 7:00 a.m., staff requested assistance after observing an inmate bleeding from an apparent head injury. The inmate was removed from the unit, medically treated, and placed in the Special Housing Unit pending further investigation. Upon review of recorded video surveillance, staff observed an inmate strike this inmate on the head with a lock affixed to a belt. Staff also observed an inmate assault the other inmate with his fists. Both the assailants were placed in restraints, medically assessed, and escorted to the Special Housing Unit. |

| Date | Description of Incident |
|------|------------------------|
| 9/5/10 | At 4:18 p.m., a cell fight was announced in a general housing unit. Responding staff ordered both inmates to stop fighting and to submit to hand restraints. Both inmates complied and were removed from the cell. After medical assessments were complete one inmate was sent to an outside hospital for more treatment. At 10:40 p.m., the inmate was sent to a trauma center from the local hospital. The inmate remains in the trauma center due to his injuries. There were no staff injuries to report. |
| 7/4/10 | At 2:24 p.m., control announced a fight in front of a building. One inmate was chasing another with a weapon. Responding staff had to separate and restrain both inmates. Staff recovered the weapon. One inmate was taken to an outside hospital due to his injuries. There were no staff injuries to report.

**At 3:09 p.m., while making rounds in a general housing unit, staff observed what appeared to have been a physical altercation in a cell. Staff secured the cell with three inmates inside. The unit was secured and upper body searches conducted and a victim was identified. Four inmates involved were placed in SHU. There were no staff injuries to report.

***At 8:22 p.m., a fight was called outside the dining hall. Responding staff physically separated and restrained the inmates. There were no staff injuries. |
| 7/1/10 | At 10:33 a.m., a fight was called in special housing. One inmate was assaulting another in a cell. Once sufficient staff were present the door was opened and staff had to separate the inmates. One staff member was injured during the incident requiring treatment at outside hospital.

**At 7:19 p.m., a fight was called in a housing unit courtyard between two inmates with weapons involved. Staff separated the inmates and escorted them to SHU. There were no staff injuries to report.

**At 9:03 p.m., a fight was called in a housing unit courtyard between two inmates. Staff separated the inmates and escorted them to SHU. There were no staff injuries to report. |
| 6/29/10 | At 6:19 p.m., two inmates attacked one on the recreation yard. The victim was laying on the ground while two assailants were kicking him in the head/face area. The assailants had to be placed on the ground by responding staff and then were restrained. There were no staff injuries to report. |

| Date | Description of Incident |
|------|------------------------|
| 6/4/10 | At 3:52 p.m., SHU staff called for assistance after two inmates started fighting in their cell. One inmate had stabbed the other. The victim was on the top bunk while the assailant stood in the door and would not show his hands to staff. Chemical munitions had to be used. After the third time munitions were used the assailant then laid on the floor and staff entered the cell and restrained both inmates. There were no staff injuries to report.<br><br>**At 10:28 p.m., a call for assistance came from a housing unit. Three staff members pulled an inmate form his assigned cell after receiving a drop note that the inmate had a weapon. During the pat search of the inmate the inmate became disruptive when staff discovered the weapon. The inmate tried to maintain possession of the weapon and in doing so injured two staff members. Staff were able to take the weapon before the inmate could assault them. The inmate was restrained and taken to SHU. The two staff members received injuries that required treatment at an outside hospital. |
| 6/3/10 | At 8:28 p.m., a fight was announced by control in a housing unit. Staff witnessed one inmate throw a broom at two other inmates. The two retaliated with weapons and assaulted the first inmate. One of the inmates held down the first inmate while the other stabbed him in the head and neck area several times. After responding staff were on the scene the inmates separated and ran back to their assigned cells. While securing the unit staff found the weapon used in a trash can. All involved inmates were taken to SHU. There were no staff injuries to report. |
| 5/2/10 | At 7:20 p.m., control announced a fight in a housing unit. One inmate assaulted two other inmates with a weapon. The inmates had to be physically separated by responding Staff. One inmate was taken to an outside hospital due to the extent of his injuries. There were no staff injuries to report. |
| 4/21/10 | At 9:06 a.m., a unit officer announced a fight in the unit with weapons involved. Responding staff had to physically separate the inmates. One inmate was transported to outside hospital by ambulance and then transferred by ambulance to the trauma center. Three staff members received injuries requiring treatment at local hospital with one of them being transported by ambulance.<br>At 9:08 a.m., a fight was announced on the recreation yard. Four inmates were involved in a fight. Three inmates jumped on one. Two towers fired less lethal munitions with negative results. Responding staff physically separated the inmates. There were no staff injuries to report. |

| Date | Description of Incident |
|------|-------------------------|
| 4/20/10 | *At 9:05 a.m., there was a one on one inmate fight in R&D. The inmates stopped fighting when sufficient staff were at the door. There were no staff injuries to report.<br><br>**At 9:31 a.m., a unit officer announced a fight with weapons involved. Staff members physically separated the inmates and located additional weapons in their pockets. One staff member received injuries.<br><br>***At 12:24 p.m., the tower officer announced a fight on the recreation yard. Less lethal munitions were fired from 3 different towers with non-compliance from the 2 inmates involved. Responding staff separated the inmates. There were two staff injuries reported. One had to be transported to an outside hospital for injuries.<br><br>****At 8:53 p.m., a unit officer announced fight in the unit. Five inmates were assaulting another inmate with weapons. Staff had to physically separate the inmates. One inmate was transported to the local hospital by a Govt. vehicle and then transferred to a trauma center by ambulance. There was three staff members injured in the incident with two of them being transported to outside hospital for treatment. The inmate that was transported to the hospital was pronounced dead on April 29, 2010. |
| 4/12/10 | At 9:19 p.m., control announced that staff needs assistance in SHU. Two inmates were fighting in their assigned cell. Both inmates refused several orders from staff to stop fighting. The door was opened and the inmates had to be physically separated, restrained, and moved from the cell by responding staff. There were no staff injuries to report. |
| 3/11/10 | At 3:40 p.m., during yard recall, two inmates began fighting. Both inmates had weapons and had to be physically separated by responding Staff. One inmate had to be taken to an outside hospital due to the extent of his injuries. There were no staff injuries to report. |
| 1/21/10 | At 3:44 PM a unit officer announced a fight in his unit with weapons involved. As responding staff entered the unit the assault stopped and the inmate was secured in a tv room. The victim was restrained and removed from the unit to the unit team area. The victim was then transported by stretcher to the health services area. At 4:21 PM the victim was transported to an outside hospital where he was pronounced dead at 4:55 PM. Institution remains on lock down status pending outcome of mass interviews. |

The correctional officers' union has publicly noted on several occasions the level of violence at USP Lee in order to get better safety equipment and other officer protection, to hire more officers, and to get better funding in general.[4]

The BOP's upper management and the Correctional Officers Union each attempt to control the message that reaches the general public. Prisoners, of course, do not have a union. Prisoners are often viewed by BOP staff as incorrigible at best and vicious animals at worst; they are generally deemed unworthy of sympathy. The news coverage of the deaths of Whitey Bulger at USP Hazelton in October, 2018 and Jeffery Epstein at MCC New York in August, 2019 brought some renewed attention to the situation and raised questions regarding the failure of the BOP to operate safely for both inmates and staff.

The discovery sought in this motion may demonstrate that the Aldana-Silva dispute was the result of a long-standing, ongoing pattern of institutional neglect at BOP facilities in general and at USP Lee, rather than premeditated murder as alleged in the indictment. The 2018 death of Abraham Aldana is part of this pattern of institutional neglect, and is the direct result of BOP's inability or unwillingness to provide adequate security to its inmates.

---

[4] https://wcyb.com/news/virginia-news/local-union-advocating-against-federal-prison-job-cuts
https://www.afge.org/article/usp-prison-break-attempt
https://www.prisonlegalnews.org/news/2009/aug/15/violence-on-the-rise-in-bop-facilities/
https://heraldcourier.com/news/officials-concerned-about-potential-cuts-at-usp-lee/article_c18f99a2-8cee-5a82-8dea-0d59fdf31f29.html
https://www.ksl.com/article/46706132/ms-13-inmates-sent-to-restricted-unit-after-prison-stabbing

### D.    September 14, 2018

As noted above, the BOP and USP Lee staff in particular may have contributed to the situation leading up to the death of Mr. Aldana. One non-exhaustive example is that the BOP ignored Mr. Silva's request to be housed separately from Mr. Aldana.

There are additional circumstances indicating that BOP negligence may have contributed to the offense, thus making it a significant issue in this prosecution. First, there was a knife in the cell shared by Mr. Aldana and Mr. Silva. This raises numerous concerns, including questions regarding the security of the prison, the presence of homemade weapons in the facility, shakedowns conducted of cells, use of pat-down searches, use of hand-held metal detectors, use of walk–through metal detectors, protocols regarding cell searches for weapons prior to putting individuals in them, and the knowledge and/or training of staff, particularly the unit staff on duty at the time of the offense.

Second, the officers on duty failed to respond to the fight in the cell (cell #A02-221) on September 14, 2018. Officers served only one lunch meal to the cell that day, despite knowing there were two inmates housed in that cell. This raises questions regarding BOP policies and procedures in general, and USP Lee's policies and procedures specifically, with respect to response to incidents, inmate physical altercations, and unit supervision including, but not limited to, officers making rounds. It also raises questions regarding the adequacy of training of staff in such procedures.

Third, Mr. Aldana had an extensive history of prior acts of violence and had, in fact, recently been involved in a serious brutal assault of his prior cell mate. This

raises questions implicating BOP staff negligence, including questions regarding prison investigation into the motive behind the assault, and the measures taken, and not taken, by prison officials in response to Mr. Aldana's violent behavior, such as separating him from other inmates for their and his protection.

Mr. Silva must obtain discovery to show the BOP's role in the occurrence of the offense with which he is charged. Likewise, he must obtain discovery regarding the full length and breadth of Mr. Aldana's prior acts of violence, including homicide, whether he was known to carry a knife, and other evidence that would relate to self-defense issues. See, e.g. *United States v. Bellinger,* 652 Fed. Appx. 143 (4th Cir. 2016).

The government alleges Mr. Silva committed premeditated First-Degree Murder, which has a requisite *mens rea* of malice aforethought. The defense disagrees that the killing was premeditated. The requested discovery is necessary to investigate lesser included offenses or to assert an affirmative defense. Mr. Silva has a constitutional right present a complete defense. *California v. Trombetta*, 467 U.S. 479, 485 (1984). "To safeguard that right, the Court has developed "what might loosely be called the area of constitutionally guaranteed access to evidence."" *Id.* citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). Mr. Silva seeks access to potentially exculpatory evidence that is critical to his ability to mount a defense against the government's allegations that the killing of Mr. Aldana was premeditated.

USP Lee's inability to provide adequate security for inmates, resulting in inmates taking action to protect themselves, is important context for a jury in

determining whether Mr. Silva had the required mental element necessary for a conviction under 18 U.S.C. § 1111[5].

### E. Discovery Provided Pre-Indictment and Post-Indictment

The discovery provided prior to the November 12, 2020 indictment was approximately 1,564 pages. It generally consisted of Mr. Aldana's BOP Central file, Mr. Silva's BOP Central file, Separatee Data, the Daily Roster Assignment and Unit Roster for September 14, 2018, a January 8, 2019 memorandum regarding the Grand Jury Subpoenaed materials, Mr. Silva's prior criminal cases, work history details for Mr. Silva and Mr. Aldana, the Evidence Recovery Logs, Chain of Custody Logs, and black and white crime scene photos at USP Lee medical of Abraham Aldana. A supplemental production included color photos of Abraham Aldana taken at the Lonesome Pine Hospital Morgue on September 14, 2018.

An additional thirteen pages of discovery was received on January 9, 2020. That production consisted of negative urinalysis lab result reports of testing of Mr. Silva on September 14, 2018; Heath Services Clinical Encounter Notes from 01/28/18, 08/20/18, 08/24/18, 08/27/18, 08/30/18 and 09/13/18; as well as a one-page USP Lee Memo from Unit Manager, D. Hughes to SIA, J. Canfield dated 11/26/2019.

On March 2, 2021, the government produced 7,941 Bates-stamped pages of additional discovery. Portions of this discovery were not included on the flash drive

---

[5] https://cic.dc.gov/page/usp-lee-inspection-report-september-6-2019 ("Throughout the facility, inmates the CIC spoke with expressed concerns about a culture of violence extending to facility leadership, and including staff both perpetrating and encouraging violence against inmates…According to interviewees, the officers and facility leadership have refused to separate cellmates who requested separation due to interpersonal conflict and have told inmates to fight or stab each other." (pgs. 3 and 10))

received and were retrieved as complete on March 5, 2021. The March production contains letters requesting inmate separation, visitor information for Mr. Aldana, OCME report of Autopsy, Unit Manager's Hughes' desk calendar, jail calls from unidentified inmates, FBI incident investigation reports, 302's and agent interview notes from various identified and unidentified inmates, administrative detention order for Mr. Silva, Chain of Custody Logs, Incident Reports, photos of USP Lee inmates, History Quarters reports for Aldana and Silva, Intake Screening; CIM Clearance; and Separatee Data for Aldana, Suicide Risk Assessment Report for Silva, Staff Daily Assignment Rosters, Unit A Inmate Rosters, memos from various USP Lee personnel regarding the incident, various news releases, FBI forms regarding Aldana incidents with staff and other inmates, evidence collection logs from SIS Agent Reece, USP Lee memo detailing BOP actions following incident, additional Clinical Health Encounter reports, letter to next of kin, Grand Jury Records (some that had been previously provided), Grand Jury videos from USP Lee - A Units 1, 2, 3 and 4, Grand Jury recordings of some Aldana phone calls between September 4 – September 10, 2018, duplicative copies of Mr. Aldana's BOP central file and medical file[6], Mass Interview forms for Units A – K, duplicative photos of Aldana at Lonesome Pine Hospital, duplicative copies of Mr. Silva's BOP central file and medical files, Grand Jury recordings of some of Samuel Silva's phone calls between September 4, 2018 – September 12, 2018, Samuel Silva's NMCD inmate file with STG and medical

---

[6] When the government produced Abraham Aldana's BOP Central file in November, 2020, it had 42 pages less than the almost duplicative production of his BOP Central file, as produced on March 2, 2021.

file, and Grand Jury transcripts and exhibits from 10/23/2018, 06/25/2019, and 07/09/2019.

## II.    Legal Discussion

### A.    Mr. Silva is seeking discovery that he is entitled to receive under well-established law.

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment for the offense, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (emphasis added). While *Brady* was a capital case that involved the suppression of favorable evidence related to the capital sentencing determination, its disclosure requirements apply to all criminal cases.

In *United States v. Bagley*, 473 U.S. 667, 676 (1985), both the Supreme Court *and the government* recognized the need of the defense to conduct adequate investigation and formulate strategy based on the complete disclosure of favorable material:

> The Government notes that an incomplete response to a specific request  not only deprives the defense of certain evidence, but also has the effect  of representing to the defense that the evidence does not exist. In  reliance on this misleading representation, the defense might abandon  lines of independent investigation, defenses, or trial strategies that it  otherwise would have pursued.
>
> We agree that the prosecutor's failure to respond fully to a *Brady* request may impair the adversary process in this manner. And the more  specifically the defense requests certain evidence, thus putting the  prosecutor on notice of its value, the more reasonable it is for the defense  to assume from the nondisclosure that the evidence does not exist, and to  make pretrial and trial decisions

on the basis of this assumption.

*Id.* at 682-83.

Importantly, the "individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). "In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant facts." *Dennis v. United States*, 384 U.S. 855, 873 (1966); *see also United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992) (*Brady* duty extends to searches of files by law enforcement for exculpatory evidence maintained by branches of government aligned with prosecution).

It is well established that *Brady* material includes impeachment material. *Giglio v. United States*, 405 U.S. 150 (1972). Questions regarding a prosecution witness's credibility should be resolved by the jury; the prosecution should not withhold "evidence that would have allowed defense counsel the means to test [a prosecution witness]'s credibility in the crucible of cross-examination." *Nuckols v. Gibson*, 233 F.3d 1261, 1267 (10th Cir. 2000); *see also Boss v. Pierce*, 263 F.3d 734, 740 n. 9, 746 (7th Cir. 2001) (granting habeas corpus relief for failure to disclose impeaching information; holding that impeachment evidence is favorable to the defense and rejecting state court "assumption that suppressed evidence must be exculpatory to satisfy the requirements of *Brady*").

In determining the constitutional materiality of potentially favorable information, neither the prosecution nor the Court should employ the backwards-looking *Brady* materiality standard in this pre-trial context. *See United States v.*

*Naegele*, 468 F. Supp. 2d 150, 153 (D.D.C. 2007) (expressing the view "that the post-trial 'materiality' standard is irrelevant to pretrial and in-trial *Brady* decisions to be made by prosecutors and trial judges" (quoting *United States v. Safavian,* 233 F.R.D. 205, 206-07 (D.D.C. 2006)); *United States v. Acosta*, 357 F. Supp. 2d 1228, 1232 (D. Nev. 2005) ("[T]he government urges *Brady*'s materiality standard is the limit of the duty to disclose. This court cannot agree. . . *Brady*'s concern whether a constitutional violation occurred after trial is a different question than whether *Brady* is the full extent of the prosecutor's duty to disclose pretrial."); *United States v. Carter*, 313 F. Supp. 2d 921, 925 (E.D. Wis. 2004) ("[I]n the pretrial context, the court should require disclosure of favorable evidence under *Brady* and *Giglio* without attempting to analyze its 'materiality' at trial. The judge cannot know what possible effect certain evidence will have on a trial not yet held."); *United States v. McVeigh*, 954 F. Supp. 1441, 1449-50 (D. Colo. 1997) ("[t]here is no established procedure for due process disclosures required by *Brady* ... [because] it is not possible to apply the materiality standard ... before the outcome of the trial is known"); *United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1198-99 (C.D. Cal. 1999) (determining that *Brady* materiality standard "is only appropriate, and thus applicable, in the context of appellate review"). These decisions are in line with the Supreme Court's decision in *Strickler v. Greene*, 527 U.S. 263 (1999), which distinguished "*Brady* material" from a "*Brady* violation":

> Thus the term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence – that is, to any suppression of so-called "*Brady* material" – although, strictly speaking, there is never a real

'*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

*Id.* at 281 (footnote omitted). At this stage, the Court should hold that the prosecution has an obligation to produce "*Brady* material" regardless of whether a post-trial analysis would determine that a failure to do so was a "*Brady* violation."

While the Due Process Clause provides a starting point for the government's disclosure obligations, Federal Rule of Criminal Procedure 16 "is broader than *Brady.*" *United States v. Baker*, 453 F.3d 419, 424 (7th Cir. 2006); *see also United States v. Caro*, 597 F.3d 608, 620 (4th Cir. 2010) ("Rule 16 differs from *Brady*, which rests upon due process considerations, and provides the minimum amount of pretrial discovery granted in criminal cases."); *United States v. Conder*, 423 F.2d 904, 911 (6th Cir. 1970) ("[T]he disclosure required by Rule 16 is much broader than that required by the due process standards of *Brady.*").

The burden of materiality under Rule 16 "normally is not a heavy burden; rather, evidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) (internal citation and quotation marks omitted). "The language and the spirit of [Rule 16] are designed to provide to a criminal defendant, in the interest of fairness, the widest possible opportunity to inspect and receive such materials in the possession of the government as may aid him in presenting his side of the case." *United States v. Poindexter*, 727 F. Supp. 1470,

1473 (D.D.C. 1989).

Furthermore, information is material under Rule 16 even if it is not itself admissible. *See United States v. Holihan*, 236 F. Supp. 2d 255, 260 (W.D.N.Y. 2002) ("Discovery is material if the information sought is relevant to the case and will lead to the discovery of admissible evidence."). "'Evidence that the government does not intend to use in its case in chief is material if it could be used to counter the government's case or to bolster a defense.' The Government should interpret the language of Rule 16 broadly to ensure fairness to the defendant." *United States v. Martinez*, 844 F.Supp. 975, 982 (S.D.N.Y. 1994) (quoting *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir.1993)).

It is crucial that any disclosures be made at a time early enough to allow the defense to investigate, follow up, and make use of the information in a meaningful manner. As the Second Circuit has observed:

> The limited *Brady* material disclosed . . . could have led to specific exculpatory information only if the defense undertook further investigation. When such a disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired. The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing. And the defense may be unable to assimilate the information into its case.

*Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001), *cited with approval in United States v. Knight*, 342 F.3d 697, 709 (7th Cir. 2003).

## B.    The legal bases for the discovery requested in this case.

Mr. Silva seeks:

A.    Discovery related to the events of September 14, 2018;

B.  Discovery related to BOP prison security, staffing, and incidents of violence at BOP institutions;

C.  Discovery related to gang activity within the BOP;

D.  Discovery of information relating to the decedent; and

E.  Discovery regarding witnesses working with or providing information to the government.

The requested documents may be admissible or lead to admissible evidence; for example, the discovery sought may lead to the submission of lesser included offenses or affirmative defenses at trial. But the Court need not decide such evidentiary matters at this time to grant this motion in its entirety. All the items requested are relevant and necessary to forming a defense.

To be sure, the requests set forth in this motion are numerous and wide-ranging. This reflects the breadth of the factors that may be relevant to a jury's determination of the requisite *mens rea* for a conviction under 18. U.S.C. § 1111. Counsel are aware that the government either has the information requested or such information is readily available to the government on request.

Each request must be viewed in the context of this specific case. The prosecution cannot claim that it is not in possession, custody, or control of all the information requested herein. Many of the requests are for information in the possession of the BOP. In this case, the BOP has acted hand-in-glove with the prosecution. The BOP and the FBI investigated this case. The BOP provided documents and other evidence to the prosecution.

Furthermore, much of the data requested can be readily compiled by the BOP. In fact, the BOP has previously done so when ordered in other federal cases such as

*Con-Ui*, *supra*; *United States v. Sablan*, No. 08-cr-0259 (E.D. Cal.); *United States v. Watland*, No. 11-cr-0038 (D. Colo.); *United States v. Richardson*, No. 08-cr-139 (N.D. Ga.); *United States v. McCluskey*, No. 10-cr-2734 (D.N.M.); and *United States v. Caro*, No. 06-cr-0001 (W.D. Va.).

The information Mr. Silva requests herein is relevant to the defense's analysis of whether to present expert opinion testimony regarding prison conditions to Mr. Silva's jury. It may also be relevant to rebut the prosecution's claim that Mr. Silva acted with malice aforethought.

Discovery requests relating to Bureau of Prisons' policies and conditions, including policies related to inmate separation orders, gang issues, inmate movement, inmate cell procedures, inmate possession of homemade weapons and knives (commonly referred to as "shanks" or "shivs"), officer misconduct and disciplinary practices and procedures, and other facts and circumstances regarding the suggestion by staff that inmates arm themselves, the incident in question and the safety and security (or lack thereof) of the prison facility are necessary and relevant for submission of lesser included offenses or affirmative defenses.

Defense counsel would be properly accused of having provided constitutionally ineffective assistance of counsel to Mr. Silva if they did not obtain, and make appropriate use of, the type of information and materials sought by the specific requests in this motion. *See*, *e.g.*, *Kimmelman v. Morrison*, 477 U.S. 365 (1986) (finding constitutionally deficient representation due to counsel's failure to seek appropriate discovery).

Access to the materials requested in this motion is necessary for Samuel Silva to receive a fair trial and to have effective assistance of counsel.

## III.  Specific discovery and *Brady* requests

As noted above, counsel appreciates the discovery that has been provided prior to this request. Some requests in this motion will include items that have already been provided. Such duplicative requests are made only to confirm that previous productions were not accidentally missing pages or data. Although defense counsel set forth herein a number of specific discovery and *Brady* requests, counsel are mindful of the Supreme Court's admonition that "[a] rule . . . declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 668, 696 (2004); *see also Douglas v. Workman*, 560 F.3d 1156, 1172 (10th Cir. 2009) ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."). By making such specific requests, Mr. Silva in no way seeks to lessen the affirmative obligation of the prosecution to provide discovery and *Brady* material as required by Rule 16 and the Due Process Clause of the Fifth Amendment, respectively. *See Boss*, 263 F.3d at 743 ("Allowing the government to withhold  favorable material evidence that it receives from defense witnesses upsets the balance   *Brady* and its progeny strike. The consequence of adopting the state's position would work a real injustice. In effect, it would punish the defense for not obtaining evidence it had no reason to believe existed."); *Crivens v. Roth*, 172 F.3d 991, 997–98 (7th Cir. 1999) ("We agree

with other circuits that have explained that 'the availability of information is not measured in terms of whether the information is easy or difficult to obtain but by whether the information is in the possession of some arm of the state.'").

The requested discovery items fall into five categories:

A.    Discovery related to the events of September 14, 2018;

B.    Discovery related to BOP prison security, staffing, and incidents of violence at BOP institutions;

C.    Discovery related to prison gangs;

D.    Discovery of information relating to the decedent;

E.    Discovery regarding witnesses working with the government or providing information to the government.

Throughout this motion, the term "documents" includes, without limitation, and whether in electronic or paper format, the following: correspondence, email communications, memoranda, reports, handwritten notes, photographs, electronic computer entries, audio recordings, video recordings, audiovisual recordings, spreadsheets and other compilations of data, and slideshows and/or PowerPoint presentations, as well as drafts and final versions of each of these items.

Based on the foregoing, Mr. Silva respectfully asks the Court to order the following materials pursuant to Rule 16 and *Brady*:

**A.    Discovery related to the events of September 14, 2018.**

1)    All video/audio recordings which captured the incident involving inmates Samuel Silva and Abraham Aldana at USP Lee on September 14, 2018, and any pertinent video/audio recordings from within USP Lee's A-Unit, including any

video/audio recordings which captured the process of escorting the subject inmates to/from their shared cell. This is to include all video/audio recordings which captured the process of searching the subject inmates for contraband, including homemade weapons, by pat down searches, handheld metal detectors, or visual searches of any inmate prior to placing them in or removing them from the cell. (Some video has previously been provided through discovery, specifically 24-hour recordings from September 14, 2018 of A-Unit.)

2)      All video/audio recordings which captured the interaction of inmates Samuel Silva and Abraham Aldana with other inmates or staff at USP Lee on September 14, 2018, and for the thirty-day period prior to September 14, 2018.

3)      All video/audio recordings of Samuel Silva from the moment he was first approached by prison staff after the incident, including his removal from the unit; any interviews with prison staff; any medical evaluations, conversations with prison psychologist(s) or psychologist(s); interviews with the office of Special Investigation Systems (SIS), Special Investigation Agents (SIA) or any other BOP employees; interviews with outside law enforcement such as the FBI, or local law enforcement. All video recordings of Samuel Silva taken while he was undergoing any physical inspection. Copies of all reports which contain any alleged statements made by Samuel Silva, or which describe any alleged behavior or conduct of Mr. Silva after the incident.

4)      All video/audio recordings which captured the assault on inmate Rudy Ball by inmate Abraham Aldana, at USP Lee in May 2018, and any video/audio

recordings from the day of said assault from within the units where it occurred, or within the unit where the inmates involved were housed.

5) The housing records/cell assignments/names and federal inmate register numbers of all inmates who were housed within the unit where Abraham Aldana died, and a photograph (head shot) of each inmate housed in the unit at the time of the incident. The names of all correctional officers and staff members at USP Lee who were on duty the day of the incident and what their assigned duties were that day. (Portions of the requested information have been provided, but this information was not received in full.)

6) All information obtained at any time by the Designation and Sentencing Computation Center (DSCC) or other BOP officials including SIS memorandum of interviews or debriefs that references Samuel Silva, and all pipeline information related to his transfers to a BOP facility before and after September 14, 2018, that is, any information sent to a receiving facility or any information given to transportation officers regarding classification or security issues for Samuel Silva.

7) Copies of all letters and emails to and from Samuel Silva that are in the possession of the BOP and all recordings "jail calls" of Samuel Silva. (Some audio calls from 9/04/18-9/12/18 have been provided.)

8) All rough notes/reports of any interviews of any known government witnesses relating to the investigation of the death of BOP inmate Abraham Aldana.

9) All rough notes of any debrief of any known government witness conducted during the investigation of the death of BOP inmate Abraham Aldana.

10)     All housing or transport records for any government witness for the period beginning September 14, 2018 to the present.

11)     Audio recordings of any interviews of government witnesses relating to the death of BOP inmate Abraham Aldana or any debrief of any government witness conducted in a course of the investigation of the death of BOP inmate Abraham Aldana.

12)     All key indicator data or correctional services significant incident data for USP Lee for the five years preceding the death of BOP inmate Abraham Aldana, including, but not limited to, data reflecting rates of assaults on inmates, rates of assaults of staff, hit rates of random urinalysis, and hit rates of suspect group urinalysis tests.

13)     The urinalysis testing schedule for the A-Unit at USP Lee from January 1, 2018 through September 30, 2018.

14)      All BOP forms BP-A657.013, inmate telephone call monitoring reports, or inmate monitoring tape access logs for any government witness, for Samuel Silva and Abraham Aldana, or any target of the investigation into the death of BOP inmate Abraham Aldana.

15)     All disciplinary or administrative segregation notices and supporting documents for any known government witness to the events of Abraham Aldana's death.

16)     All recordings of radio communications at USP Lee within 12 hours before and after the incident resulting in the death of BOP inmate Abraham Aldana.

17) Any electronic records establishing the locked or unlocked status of all cell doors and cell block entrances or exits at the housing unit for the entire day of September 14, 2018.

18) All records relating to the decision made to install, replace, and maintain cell bunks in USP Lee made from metal rather than other materials.

19) All records documenting the discovery of contraband/prison weapons at USP Lee for the period January 1, 2015 through September 14, 2018 including the notation of what material the weapons were made of and, in the case of shivs, whether they were made of metal or other material and, if metal, where the metal was obtained by the inmate or inmates involved.

20) All records specifically documenting the search and discovery of contraband/prison weapons at USP Lee for the period January 1, 2017 through December 31, 2018 relating to weapons located in the housing units.

21) Any documents establishing physical mail or phone contact between any investigator participating in the investigation of the death of BOP inmate Abraham Aldana and any government witness or his attorney.

22) Any documents establishing that government witnesses received any documents relating to the death of BOP inmate Abraham Aldana.

23) A complete copy of Samuel Silva's BOP C-file, all BOP documents alleging misconduct or disciplinary infractions; all BOP documents that detail Samuel Silva's work and education history; all BOP documents that include medical or mental health treatment of Samuel Silva that are outside of the scope of existing

Protective Orders. This is to include all six sections of inmate Samuel Silva's Central files. (Portions of the requested file have been provided through discovery.)

24)     All documents reflecting all assignments of prisoners designated members of strategic threat groups, or disruptive groups, or management interest groups at USP Lee from January 1, 2017 until December 31, 2018.

25)      Central Inmate Monitoring System (CIMS) clearance and separation data for inmates Samuel Silva and Abraham Aldana. All information to support the CIM (Central Inmate Management) assignments and Classification of each of these inmates.

26)     All documents, including the audio recordings of any hearings, related to any BOP disciplinary or administrative proceedings related to the death of BOP inmate Abraham Aldana.

27)     All video recordings of activity at USP Lee, taken anywhere within the facility, on September 14, 2018.

28)     All video recordings of activity at USP Lee, taken anywhere within the facility for 30 days prior to September 14, 2018 and three days after.

29)     All documents detailing institutional lockdowns at USP Lee for 24 months prior to September 14, 2018. This includes documents that provide the dates of and reasons for each lockdown, and whether it was a full lockdown or a modified lockdown.

30)      It is believed that videos of inmate assaults have been collected on occasion into a montage-type video compilation including some that may have been

labeled "Cowboys vs. Indians," "D.C. vs. Philly Boys," and the like and were widely distributed within the BOP and even briefly on YouTube. Mr. Silva requests all videos that have been collected or used for training or other purposes which show actual inmate-on-inmate assaults at USP Lee or other BOP facilities, for the dates of January 1, 2017 to the present.

31)     Copies of the Board of Inquiry Report or Regional Inquiry Team (After Action Report) or Local Inquiry Team Report or any after action report and summary report conducted at USP Lee as a result of the incident on September 14, 2018. Also, the local response shall include the corrective action plan to the recommendations; all documents, records, video recordings, or working papers or personal records reviewed and created by members of the boards or teams, to include electronic material from September 14, 2018 to present.

32)     Copies of all Board of Inquiry Reports, Regional Inquiry Team Reports, Local Inquiry Team Reports, and local responses and corrective action plans or recommendations for all incidents of violence resulting in injury to inmates or staff at USP Lee for the past twenty years. Also, all documents, records, working papers, or personal records created by members of the boards or teams, to include electronic material.

33)     Copies of all Board of Inquiry Reports, Regional Inquiry Team Reports, Local Inquiry Team Reports, and local responses and corrective action plans for all BOP homicides for the past twenty years. This includes all documents, records,

working papers or personal records created by members of the boards or teams, including electronic material.

34)    Threat Assessment conducted on the Security Threat Group New Mexican Syndicate (SNM).

35)    Threat Assessment conducted on the following Security Threat Groups: Mexican Mafia (EME); MS-13; Puente-13 and Sureños including breakdown by total count, institution, and security level, to include all members, associates, and subjects from September 14, 2015 to present.

36)    Breakdown of Security Threat Group members, associates, and suspects by number and group of the inmate population on September 14, 2018.

37)    Copies of SIS bulletins or advisories issued for the inmate group/Security Threat Groups New Mexican Syndicate (SNM), Mexican Mafia (EME), MS-13; Puente-13 and Sureños.

38)    Copy of the SIS intelligence briefings provided to the institutional executive staff for a 12-month period prior to the incident of September 14, 2018 and 6 months following the incident of September 14, 2018.

39)    Copy of the Validation Package and/or Validation Information for Samuel Silva, Abraham Aldana, and any inmate identified as a potential witness to the incident on September 14, 2018.

40)    Copy of all unit officer's post orders for the housing unit at USP Lee, both the general and specific sections at the time of the incident.

41)     Copy of all A-Unit Logbooks from January 1, 2016 through September 14, 2018.

42)     Copy of the complete SIS file regarding the death of BOP inmate Abraham Aldana, to include the SIS report, Form 583, all materials required by the SIS Inmate File Check List, and all required Sentry data; all notes and records of all interviews, both staff and inmates; including but not limited to, all Mass Interview reports or forms. (Portions of Mass Interview Forms for Units A-K were provided through earlier discovery disclosure; however, the interview forms for some inmates, specifically those later interviewed in more detail by the government, were not provided.)

43)     All Posted Picture File, STG (Security Threat Group) file, AIMS information, SIS card file, or any intelligence information maintained in the SIS Office for all inmates at USP Lee on September 14, 2018.

44)     Copy of the BOP Inmate Profile for Samuel Silva.

45)     Copy of the BOP Inmate Profile for all inmates housed in A-Unit on September 14, 2018.

46)     All SIS information/intelligence maintained in the SIS office on the following inmate groups/associations, including all members, suspects, and associates: the New Mexican Syndicate (SNM); the Mexican Mafia (EME); MS-13; Puente-13 and Sureños from January 1, 2017 to the present.

47)     All information stored or maintained in the BOP intelligence (SIS) systems on Samuel Silva at each Bureau of Prison facility and prison where he was

incarcerated, both in formal files and informal/investigative files and any data bases: AIMS, TRUINTEL, card files, in written form or maintained electronically.

48) A copy of the TRUINTEL Global Inmate Report for Samuel Silva and Abraham Aldana.

49) Copies of the summary report of the Daily Sensitive Information Report and the Daily Lieutenants Log for a twelve-month period prior to September 14, 2018 and twelve months following.

50) Copies of all Daily Lieutenant's Operational Logs from September 14, 2018 to September 14, 2019.

51) Copies of Form 583, Report of Incident, prepared by USP Lee for the years 2016-2018.

52) Copies of all monthly Lieutenants' meeting minutes from September 14, 2018 to September 14, 2019.

53) Copy of all warden/executive staff meetings and department head meetings from September 14, 2018 to September 14, 2019.

54) Copies of the Institutional Mass Shakedowns/Searches from September 14, 2018 to September 14, 2019.

55) Records regarding contraband items found in USP Lee inmates' possession and/or their living or work areas which identify and discuss the processing and disposition of the contraband, for January 1, 2016 through December 31, 2018, including but not limited to housing unit shakedown logs.

56) Copies of all Correctional Services Program Reviews and responses for January 1, 2016 through December 31, 2018.

57) Copies of the two Program Reviews of USP Lee's Correctional Services Department that were conducted prior to September 14, 2018.

58) Copies of all regional staff assistance visits for/to USP Lee Correctional Services and the Disciplinary Hearing Officer and local responses to each visit for the period of January 1, 2017 through December 2018.

59) The information required by the Inmate Discipline Program Statement 5270.09, regarding the Data Collection Requirements Codes 100 and 101 to include the following:

   a. Type of weapon
   b. Type of victim
   c. Nature of injury
   d. Referral for prosecution

for the period of January 1, 2017 through December 2018.

60) The average daily population of the Special Housing Unit at USP Lee for the years 2016, 2017, 2018, and 2019.


61) Copies of all Institution Character Profile reports conducted regarding USP Lee from activation to date.

62) Copies of all Prison Social Climate Surveys reports regarding USP Lee from activation to date.

63) Copies of all Institutional Duty Officer reports regarding USP Lee from March 14, 2018 to March 14, 2019.

64)     Location, calibration, and daily inspection documents and maintenance records of all walk-thru metal detection devices within USP Lee from March 14, 2018 to March 14, 2019.

65)     Copies of USP Lee's pat search and visual search logs maintained and required by the Correctional Services Manual from January 1, 2016 through December 31, 2018.

66)     Copy of USP Lee's Correctional Services quarterly perpetual audit schedule and audits and correction action plans from March 14, 2018 to March 14, 2019.

67)     Copy of the SIS intelligence briefings provided to USP Lee's executive staff from March 14, 2018 to March 14, 2019.

68)     All institutional prepared Report of Incident Form 583's for all inmate-on-inmate assaults at USP Lee, including but not limited to assaults with weapons from September 14, 2016 to March14, 2019.

69)     Chronological Disciplinary Data (CDA) for guilty findings for the following prohibited acts, for all USPs for the following years; FY 2015, 2016, 2017, 2018, 2019.

    a.  Code 100 and Code 100A, Killing
    b.  Code 101 and Code 101A, Assaulting any person with serious injury, for inmate on inmate and inmate on staff.
    c.  Code 104 and Code 104A, Possession of weapon or sharpened instrument.
    d.  Code 224 and Code 224A, Assault with less serious injuries for inmate on inmate and inmate on staff.
    e.  Code 201 Fighting with another person

70)    Summary Report of the Guilty Findings for the following prohibited acts by calendar year, 2016-2018, which have occurred at all USPs:

   a. Code 100 Killing
   b. Code 101 Assault with serious injury
   c. Code 104 Possession of a weapon
   d. Code 224 Assault with less serious injuries
   e. Code 201 Fighting
   f. Code 203 Threatening Bodily Harm

71)    Copies of USP Lee's Disciplinary Hearing Officer Reports for:

   a. Code 100 Killing
   b. Code 101 Assault with serious injury
   c. Code 104 Possession of a weapon
   d. Code 224 Assault with less serious injuries
   e. Code 201 Fighting
   f. Code 203 Threatening Bodily Harm

72)    Copies of all Office of Internal Affairs staff sustained misconduct referrals at USP Lee following the incident of September 14, 2018.

73)    Copies of Annual Refresher Training Agenda for the past five years, to include all specialty training and rationale for the training; Annual Training Plan and training committee meeting minutes and recommendations for the years 2015 through 2019.

74)    Documentation to support that the Warden at USP Lee reviewed and disseminated After Action Summary Reports with Associate Wardens and Captains demonstrating any information and/or recommendations to enable local review of procedures and determination of what appropriate changes to procedures should be made for the years 2017-2020.

75) Copies of all Unfair Labor Practices, local labor grievances, and minutes of all Office of Labor Management Relations meetings for the years 2015 through 2019.

76) Annual Training Plan and training committee meeting minutes and recommendations for the years 2015 through 2019.

77) American Correctional Association report and certification for the years 2010 through 2018.

78) Copy of USP Lee's local emergency plan for staff response to institutional emergencies.

79) Copies of all emergency drills conducted at USP Lee for the years 2015 through 2018.

80) Please state: (a) the degree of understaffing, by percentage at USP Lee for the years 2017 through 2019, inclusive, (b) the degree of underfunding, by percentage, at USP Lee for the years of 2017 through 2019, inclusive.

81) The entire personnel files, including, without limitation, curriculum vitae/resumes, employment applications, reviews, complaints, and disciplinary actions for all USP Lee staff assigned to the A Unit from January 1, 2018 through September 14, 2018.

82) Identification of all disciplinary action taken by BOP against any BOP employees for violation of BOP policies relating to the privacy and disclosure of inmate records and files from 2015 to 2019.

83) All SIS investigation material related to the death of Abraham Aldana, including, but not limited to: separate inmate file/folder for Samuel Silva; crime scene photographs; crime scene sketches; crime scene video; crime scene administrative log; evidence photos; evidence recovery logs and receipts; Sentry quarters roster; staff duty roster; mass interview notes; investigator notes; Miranda rights forms; medical reports; victim and suspect photos for injuries; all witness statements in whatever form they exist; autopsy report; telephone search reports; copies of all subpoenas; Sentry workups on all inmates involved (for example, forms PP 44, PP 41, PCD, PPJ8, PPG0, PP10, and PP15); copies of incident reports; and copy of SIS Investigation Report, and After Action Report. (Portions of this request have been provided through discovery, but are incomplete.)

84) A population roster for every Unit at USP Lee on September 14, 2018, including documentation of empty cells.

85) A copy of all notices posted either on the electronic bulletin board, sent through e-mail, or physically posted for inmate review for the years 2017 and 2018.

**B.      Discovery Related to BOP Prison Security, Staffing, and Incidents of Violence at BOP Institutions.**

86) Any personnel files, incident/disciplinary reports, or other files, electronic or any other format, regarding, but not limited to, Warden Michael Breckon and SIS Agent Baker.

87) From January 1, 2015 to the present, data on the frequency of 100-level misconduct and 200-level assaultive misconduct for each U.S. Penitentiary.

88) From January 1, 2015 to the present, data on the frequency of 100-level misconduct and 200-level assaultive misconduct aggregated for all U.S. Penitentiaries.

89) The BOP Performance Budget Congressional Submissions for fiscal years 2017-2019.

90) A list of the number of Code 100 and Code 101 incidents at each United States Prison each year between January 1, 2015 to the present, both by raw number and by percentage of the inmate population.

91) The Correctional Services Significant Incident Data for incidents of assaults on inmates as raw numbers, as well as rates per 5,000 inmates for all United States Prisons for each year between January 1, 2015, to the present.

92) The number of homicides committed in USPs for each year between January 1, 2015 to the present, and the institutions where the homicides occurred.

93) The Federal Bureau of Prisons State of the Bureau Report for the years 2013-2018.

94) Copies of all Prison Social Climate Surveys for 2015 to the present.

95) All documents relating to reports of Code 101 violations within the BOP from January 1, 2013 to the present, including graphs, supporting data, and supporting documentation.

96) All documents relating to reports of Code 104 violations within the BOP from January 1, 2013 to the present, including graphs, supporting data, and supporting documentation.

97)    All BOP After-Action Reports prepared from January 1, 2013 through the present.

98)    All documents relating to the BOP's mission critical post initiative, including, without limitation, the following:

> a. A memorandum from the Assistant Director of Correctional Programs describing how each BOP facility was to gather information for 6 months regarding overtime and staffing under the mission critical post initiative;
>
> b. The information gathered in response to such memorandum; along with and supporting documentation;
>
> c. All documents reflecting the BOP's analysis of such information and/or evaluation of the effectiveness of the mission critical post initiative.

99)    All documents relating to BOP or USP Lee policies, practices, guidelines, or procedures for conducting mass interviews from 2013 to the present.

100)    All documents reflecting BOP staff training regarding policies and procedures for supervising inmates in housing units during facility lockdowns prior to and including September 14, 2018.

101)    Upon information and belief, for some time, inmate disciplinary data has been kept in a coded fashion that should be available to correctional officers manning posts in the BOP. This information is potentially valuable in the control of violence in an institution in general and for the control of weapons within an institution. For instance, among the various aspects of the Inmate Disciplinary Program (IDP), there exists a field designated as an "Additional Tracking Identifier, or "ATI." See IDP, Program Statement 5270.09, Appendix D, p.41. Following an

incident for which an inmate is found responsible, a Discipline Hearing Officer (DHO) or Unit Discipline Committee (UDC) must impute the nature of the offense into the SENTRY system via the Inmate Discipline Data report. The IDP expressly states, "It is critical that the data is reported correctly and uniformly." The ATI consists of three (3) fields: 1) Type of Victim; 2) Type of Weapon Classification and 3) Nature of Injury Assessment. For the 'Type of Victim' Field, there are three (3) possible entries: "I = Inmate" "S = Staff" or "O = Other." For the 'Type of Weapon Classification,' there are thirteen (13) possible classifications:

A gun
B sharp object (used to inflict cutting injury)
C pointed object (used to inflict stabbing injury)
D solid\blunt object (thrown or used to hit)
E toxic or flammable fluids or substances
F fists\hands
G feet\legs
H bodily fluids\waste (spit, urine, feces, blood, etc.)
J teeth
K head
L water
M other or unknown
N N no weapon.

The IDP also provides a definition for the term "weapons" as follows: "Weapons refers to objects, instruments, or substances listed above that the inmate controlled at the time of the offense, and are considered an element of the offense." See IDP, Program Statement 5270.09, Appendix D, p.42. Finally, the 'Nature of Injury Assessment' Field has five (5) possible classifications: 1 – No Injury; 2 – Minor Injury; 3 – Moderate injury; 4 – Major Injury and 5 – Fatal Injury. Therefore, the defense requests the following:

a. The report of ATI data broken down by the fields described above for all United States Penitentiaries for the time period 2010 through 2018.

b. The specific report of report of ATI data broken down by the fields described above for USP Lee.

c. A list of any correctional officers disciplined with date, name of officer, and disciplinary measure taken in any USP for failing to take note of the ATI code and therefore failing to otherwise take action when required by any written mandate, Post Order, Program Statement, protocol, procedure, or otherwise accepted best practices.

d. A list of correctional officers disciplined with date, name of institution, name of officer, and disciplinary measure taken by any USP senior management for an officer failing to properly conduct a pat search, use a hand-held metal detector, and/or failing to force inmates to use walk through metal detectors.

e. A list of correctional officers disciplined with date, name of institution, name of officer, and disciplinary measure taken by any USP senior management for an officer failing to properly conduct a pat search, use a handheld metal detector, and/or failing to force inmates to use walk through metal detectors.

f. A list of correctional officers disciplined with date, name of institution, name of officer, and disciplinary measure taken by any USP senior management for an officer failing to protect inmates or a specific inmate from assault or for failing to intercede to stop an ongoing assault.

g. A list of correctional officers disciplined with date, name of institution, name of officer, and disciplinary measure taken by any USP senior management for an officer failing to perform required security checks and/or rounds.

h. A list of correctional officers disciplined with date, name of institution, name of officer, and disciplinary measure taken by any USP senior management for an officer relating to allegations of BOP staff misconduct (intentional wrongdoing) at USP Lee from January 1, 2010 to the present.

## C.    Discovery related to Prison Gangs.

As part of its intelligence gathering functions, the Bureau of Prisons keeps

data and information on inmates who are members of a "prison gang," sometimes

referred to by the BOP as a Security Threat Group (STG) or a Disruptive Group (DG), or a "management interest group." The following materials are requested:

102)    Documents reflecting groups considered by BOP to constitute a prison gang, whether it be an STG, a DG, a "management interest group," or other BOP label.

103)    Documents compiled from January 1, 2016 to the present, reflecting the number of inmates who are considered to be members and/or affiliates of a prison gang, and the total number of inmates within the BOP who are considered members of a prison gang.

104)    Documents compiled for each of the years 2013 to present, reflecting the number, frequency rate, and/or prevalence rate of all 100- and 200-Level disciplinary infractions.

105)    Comparison data to reflect whether these infractions were committed by members of a prison gang or by inmates who were not members of a prison gang.

106)    In addition to the comparative frequency information requested above, please provide documents reflecting the number of inmates involved in committing these infractions (i.e. prevalence rates) so that the potential of a few inmates being responsible for many infractions can be identified.

107)    If BOP aggregates disciplinary misconduct associated with each prison gang, in comparison to non-gang member inmates, according to different parameters than level of infraction as set forth above, that information (including comparable statistics) is requested as well.

108) Documents reflecting the number of homicides in BOP for each of the last five years, reflecting date, facility, and perpetrator designation as a member of any prison gang (whether STG, DG, "management interest group," or other label) and the name of the specific gang.

109) From January 1, 2016 to the present, all policies, procedures, directives, or criteria used in institution placements or assignments by the Designation and Sentence Computation Center (DSCC) or other BOP institutional assignment entity for placement of alleged members of the Mexican Mafia (or EME), Sureños, Puente-13, or SNM (Syndicato New Mexico).

110) From January 1, 2016 to the present, all bulletins or "monitoring reports" or "trends" referring to the Mexican Mafia (or EME), Sureños, Puente-13, or SNM (Syndicato New Mexico) in the possession of the Martinsville, West Virginia BOP National Gang Unit office, the BOP Sacramento Intelligence Unit, or the National Gang Intelligence Center or Homeland Security.

**E.    Discovery of information relating to the decedent.**

111)  All reports, transcripts, or other documents in the possession, custody, or control of any government agency of any investigation regarding Abraham Aldana.

112)  All reports, transcripts, or other documents in the possession, custody, or control of any government agency referencing any suspected crime of violence, whether completed or not, wherein Abraham Aldana is mentioned.

113)  All information in the possession of any government agency connecting Abraham Aldana to any act of violence.

114) All documents relating to the BOP's acceptance, designation, and classification, and transportation of Abraham Aldana.

115) All documents relating to any investigation, assessment, and/or treatment of Abraham Aldana for mental health issues.

116) All Presentence Investigation Reports for Abraham Aldana.

117) All Administrative Detention Orders referencing Abraham Aldana.

118) All Disciplinary Segregation Orders referencing Abraham Aldana.

119) All photographs of Abraham Aldana within the possession, custody, or control of the U.S. government.

120) All information obtained at any time by the Designation and Sentencing Computation Center (DSCC) or other BOP officials including SIS memorandum of interviews or debriefs that references inmate Abraham Aldana, and all pipeline information related to his transfers within the BOP, that is, any information sent to a receiving facility or any information given to transportation officers regarding classification or security issues for inmate Abraham Aldana.

121) Copies of all letters and emails to and from inmate Abraham Aldana that are in the possession of the BOP and all recordings of "jail calls" of inmate Abraham Aldana. (Some audio calls from 09/04/18-09/10/18 have been provided.)

122) A complete copy of inmate Abraham Aldana's BOP Central File (C-file); all BOP documents alleging misconduct or disciplinary infractions; all BOP documents that detail Aldana's work and education history; all BOP documents that include medical or mental health treatment of Aldana.

123)   Copies of the Board of Inquiry Report or Regional Inquiry Team (After Action Report) or Local Inquiry Team Report or any after action report and summary report conducted at USP Lee due to the May 2018 incident/assault on inmate Rudy Ball perpetrated by inmate Abraham Aldana. Also, the local response shall include the corrective action plan to the recommendations, all documents, records, video recordings, or working papers or personal records reviewed and created by members of the boards or teams, to include electronic material from 2005 to present.

124)   Copy of the BOP Inmate Profile for inmate Abraham Aldana.

125)   All SIS investigation material related to the May 2018 assault by inmate Abraham Aldana upon inmate Rudy Ball including, but not limited to: separate inmate file/folder for inmates Aldana and Ball; crime scene photographs; crime scene sketches; crime scene video; crime scene administrative log; evidence photos; evidence recovery logs and receipts; Sentry quarters roster; staff duty roster; mass interview notes; investigator notes; Miranda rights forms; medical reports; victim and suspect photos for injuries; all witness statements in whatever form they exist; autopsy report; telephone search reports; copies of all subpoenas; Sentry work-ups on all inmates involved (for example, forms PP 44, PP 41, PCD, PPJ8, PPG0, PP10, and PP15); copies of incident reports; and copy of SIS Investigation Report, Use of Force Reports, and After Action Report.

126)   All information stored or maintained in the BOP intelligence (SIS) systems on Abraham Aldana at each Bureau of Prison facility and prison where they

were incarcerated, both in formal files and informal/investigative files and any data bases: AIMS, TRUINTEL, card files, in written form or maintained electronically.

## F. Discovery regarding witnesses working with the government or providing information to the government.

127) The name, address, and date of birth of any cooperating witness (as noted in produced discovery by initials, specifically, but not limited to: E.S./M.S., P.R., J.L. R.P., G.A., T.M., S.M., N.H., I.O., J.G., R.M., F.Q., M.J.A., J.A., B.C., M.F., D.L., and A.Z.), as well as any other known or unknown witnesses that have, or will be, cooperating with the government.

128) The case number and name of the prosecutions in which each cooperating witness has previously been used as a cooperating witness.

129) The case names and numbers of any trials or evidentiary hearings at which each cooperating witness has testified concerning: his or her own prior criminal activity; payments or rewards provided him by the federal or state government; efforts made to induce others to participate in criminal activity; or other purported law enforcement-related matters.

130) Any information, whether or not memorialized in a memorandum, agent's report or other writing, regarding promises or requests of immunity or leniency, preferential treatment or other inducements made to each cooperating witness, or to any family member, friend, or associate of each cooperating witness, in exchange for cooperation, including dismissal or reduction of charges, assisting in matters of sentencing or deportation, or promises regarding payments for expenses or testimony or eligibility for any award or reward.

131) Any statement made or information or document provided by a prospective government cooperating witness that conflicts in part or in whole with: (1) the statement of another prospective witness; (2) a prior statement made by the same government cooperating witness; or (3) any other documents or witness.

132) Any report, document, or information which details the criminal activities of the cooperating witness which were undertaken by said witness with or without the authority or approval of the federal or any state government, but for which the federal government or any state government has elected, formally or informally, not to prosecute.

133) All records available to federal or state government agencies reflecting the arrest, conviction, and investigative history of any cooperating witness.

134) Information concerning misconduct by any cooperating witness, including misconduct that reflects on the lack of candor, truthfulness, or law-abiding character of the cooperating witness, such as uncharged criminal conduct or fraud.

135) All information, records, and transcripts which in any way indicate or reveal that any cooperating witness, or any other prospective witness has provided untruthful false, misleading, incomplete, or inaccurate information or testimony, in connection with this or any other case, to any federal or state law enforcement officer or agency, grand jury, or federal or state trial court.

136) If given a polygraph examination, the results of the examination performed on any potential witness as well as any information concerning the unwillingness of any potential witness to submit to a polygraph examination.

137) All recordings of telephone calls made by any known government witness (whether or not the witness has been identified as a government informant) from September 1, 2018 to the present. (Some calls from inmate "ES" have been provided.)

138) All copies of correspondence, including emails received or sent by any known government witness (whether or not the witness has been identified as a government informant) from September 1, 2018 to the present.

## IV.    Severability

Each request in this motion, whether made in one or more paragraphs, is severable. Multiple requests, if made in one paragraph, should be treated independently. If certain information is refused by the government, Samuel Silva requests all other information, even if incomplete. If legal authority or the equities make information available sooner under one authority, or set of authorities, than the other, Samuel Silva requests that the information be made available at the earliest time.

## V.    Continuity of Request

Each request in this motion is a continuing request, up to and including the time of trial and hearing, and thereafter, to provide any information or thing that may hereinafter come into the custody, possession, or control of, or become available or known to the United States, or any other responsible person which would be described by any of the paragraphs above, if it or they are not within such custody, possession, control, or knowledge of the United States. This is pursuant to Fed.R.Crim.P. 16 (c), the Eighth Amendment of the United States Constitution,

*Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, and *Kyles v. Whitley*, 514 U.S. 519 (1995).

## VI.    Conclusion

Samuel Silva requests that the Court order the immediate disclosure of the foregoing by the government to the defense.

Respectfully Submitted,

JUVAL O. SCOTT
Federal Public Defender
for the Western District of Virginia

s/*Juval O. Scott*
Juval O. Scott
Office of the Federal Public Defender
for the Western District of Virginia
210 First Street SW, Suite 400
Roanoke, VA 24011
(540) 777-0880
Indiana Bar No. 23741-49

s/ *Arin Melissa Brenner*
Arin Melissa Brenner
Office of the Federal Public Defender
for the Western District of Virginia
 210 First Street SW, Suite 400
Roanoke, VA 24011
(540) 777-0884
New York Bar No. 4990974

**Counsel for Samuel Silva**

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was electronically filed via CM/ECF and will be served electronically to counsel of record on this 10th day of June, 2022.

s/*Juval O. Scott*